The first case on the calendar is Seneca Nation v. State of New York Appellant Thank you. Thank you, Judge Pooler, and may it please the court. Three critical, uncontroverted facts underpin the Seneca Nation's case before this court. First, the arbitration panel majority expressly found that the plain terms of the Nation State Gaming Compact did not place a year's 15 to 21 payment obligation. Second, the panel majority further acknowledged that neither party presented such an obligation to the Secretary during the 2002 review process, and the Secretary made no mention of it during her consideration of the compact. Third, and finally, the panel majority accordingly made no claim that the Secretary in fact considered and approved such a payment obligation, nor did the District Court, nor does the State. But express review and approval of compact terms, and of revenue-sharing terms in particular, is precisely what IGRA requires. And in going beyond compact interpretation to enforce a year's 15 to 21 payment obligation on the Nation in the absence of such approval, the panel majority acted and manifest disregard of the law. Counsel, the arbitration panel treated the extension as part of the original contract. We, as I understand approving, confirming arbitration awards, don't even get to the merits. We only have to look at how the arbitration panel did its job. So leaving the merits aside, which you turn to immediately, you'll have to tell me how the arbitration panel didn't discharge their duties faithfully and accurately. Yes, Your Honor. Judge Pooler, we are not questioning the panel majority's interpretation of the compact. We understand the strictures of manifest disregard review. But what we are saying is taking the compact interpretation as the panel did it, taking that as a given, one cannot extrapolate from the panel majority's conclusions to a conclusion that the Secretary then approved the interpretation that the panel majority arrived at. So, in other words, under the Indian Game Regulatory Act, there are two requirements here for this payment obligation to be enforceable. The parties had to agree to it, but then the Secretary had to approve it. And what the panel majority found was first… Didn't the Secretary approve the original compact? And didn't that include the renewal terms? Yes, exactly, Your Honor. But what the panel majority found expressly, and this is at Appendix 59, is that the renewal term itself was ambiguous as to what would happen upon renewal. Would the payment obligation, which I should say spanned the period of renewal, the 14-year payment obligation, would that continue to its end and then the payment would come to an end? Or would there be a restart of a payment obligation? So, this sounds to me like classic contract interpretation, which you find, which the parties assigned to the arbitration panel. Isn't that correct? That's correct. So, I need to be crystal clear. We are taking the panel's contract conclusions as the very predicate of our argument because the panel said two critical things. First, it said, within the four corners of the compact, there is no mention of a years 15 to 21 payment obligation. That was not presented to the Secretary by virtue of the plain terms of the compact. And then the panel majority said, and nor did the parties present the obligation to the Secretary in any other form. The parties' submissions, very detailed submissions to the Secretary of the Interior, discussed a payment obligation in terms of years 1 to 14. It said nothing beyond that. So, the panel found a years 15 to 21 payment obligation to exist by virtue of extrinsic evidence, which, by its own account, was never presented. Mr. Tanji? Yes, yes, Your Honor. Why is it that we can't look at it in the following slightly higher order way? So, I take it that your argument is that the Secretary did not approve this arguably ambiguous – well, in your view, definitely ambiguous – provision. Is that right? Yes. In our view, the Secretary absolutely did not have this payment obligation in front of her. Right. And so, it requires specific Secretary approval of that ambiguous provision. That's your position. Right. Our position is that no payment obligation can be enforced absent the Secretary having considered it. So, what was the utility or purpose of having an arbitration provision? In other words, why can't we see this as the Secretary's approval of, among other things, an arbitration provision where arbitration would, among other things, resolve ambiguities? And that's the approval of the compact. And if that's true – and I might be wrong about that, and you might dispute it – but if that's true, then the system of approval that you're relying on, and I appreciate it, has worked. In other words, you have an ambiguous term resolved by an arbitral panel, and that is the mechanism that the Secretary has approved. So, I think, Your Honor, that's pretty much the state's argument here, which is that the Secretary approved an ambiguity or approved the arbitration panels. Well, it's that the Secretary approved the arbitration mechanism. The arbitration panels' ability to resolve an ambiguity. But what the Secretary approved was a dispute resolution process. And here, if the arbitration panel had found that the language, the terms were clear, we wouldn't be here. That would have made it clear that the Secretary had, in fact, considered this provision. Or if the arbitration panel had said there was extrinsic evidence presented to the Secretary, and therefore she blessed the provision, we wouldn't be here. But I think this notion that the Secretary approved any resolution of ambiguities goes too far. And let me give you an example. If there was an ambiguity in the compact and the arbitration panel had resolved it to require the nation to pay a gaming tax, that would clearly be in violation of Section 2710 of IGRA. And to say then that a gaming tax could be enforced against the nation would be in clear disregard of the statute. So, the agreement to arbitrate is always tabbed by the governing law. You're not making that argument that the extension with a payment is in disregard of other statutes, are you? We're making the argument, Your Honor, that to say here that the arbitration panel had carte blanche to ordain any ambiguity, any interpretation of an ambiguity, would in fact violate IGRA. Because the requirement of secretarial approval, especially of revenue-sharing provisions, is a linchpin of the statute. It is what maintains the balance between the states and Indian tribes in the world. But it's secretary approval of the compact. It doesn't say of every term of the contract. It's of the compact. That's correct, Your Honor. But a compact can't take effect without that approval. And no provisions are exempted from it. And that argument which the state makes that, well, once a compact is approved, then any provision can have force, that's a very dangerous argument. Because it would allow states and tribes to enter into side agreements, to have agreements with respect to other provisions. The flip side of that, Mr. Kanji, is that if you're right, then it might render the arbitration mechanism somewhat superfluous. But maybe more importantly, every battle about every provision would then have to be delayed and subject to secretary approval. And that sounds like it's administratively not right to me. Your Honor, I would point you to the dissent to the panel majority. It's written by a former Assistant Secretary of Indian Affairs who had as part of his purview the approval of the compact. What he says, which I think is critical, is that this is not any provision. This revenue-sharing provision is a highly important and highly controversial provision, especially given the level of payments here. And where you have a situation where the secretary in the original approval painstakingly reviewed the year 1 to 14 obligation, commissioned economic analysis, commissioned further study from the parties to then say, well, she implicitly pre-approved a 15 to 21 obligation if an arbitration panel ordained it, takes that entire process of secretarial review and undermines it. And one point to go back to. Join the meeting. To go back to your point about the provisions, Judge Loyer, a really important fact, too, is to keep in mind here that the secretary only deemed this compact approved insofar as consistent with the provisions of VIGRA. The secretary had enough concerns about the provisions that she didn't even affirmatively approve the compact. She allowed it to go into effect. And after this painstaking review, the state's position is if a provision then comes along later, if an arbitration panel majority conjures from an ambiguity a provision, that that goes into effect absent any ability of the secretary to then review that provision to see whether it is, in fact, consistent with the provisions of VIGRA. I simply don't think that could be squared with the requirements of the statute. And I'll close by saying that I think this is very analogous to Judge Pooler's opinion for this court in the Hardy case, where Judge Pooler said that under no reading of the facts could the panel's conclusions there be squared with the law. And here we have the panel's own conclusions of the facts. The fact that there is nothing within the four corners of the compact. The fact that nothing was presented to the secretary simply can't be squared with the notion that the secretary, in fact, approved this incredibly important obligation that normally would receive intense secretarial review. Thank you, counsel. You reserved three minutes for rebuttal. We'll hear from the state of New York. Thank you, Your Honor. Greg, may it please the court. Greg Starner of Whiten Case on behalf of the appellee, state of New York. I think, Judge Pooler, you hit on, I think, a really critical point here. And it's what the relevant question is. What's the relevant standard for the court to apply in reviewing what is a motion to vacate an arbitration award? A lot of the facts are really not in dispute. The parties submitted their dispute to an arbitration pursuant to the party's agreement to arbitrate their dispute. That was a contract that they agreed to as a contract that was approved by the secretary. And the question is, did the arbitrators discharge their duty? And the answer to that is a clear yes. And I think it's critical for us to, I think, focus on what the relevant standard of review here is for this award. They are not seeking to vacate this under the statutory basis under the FAA. They are seeking to vacate this under the manifest disregard standard, which, as this court has acknowledged and recognized, is effectively a doctrine of last resort. It sets a very high bar. And it really dictates that it severely limits judicial review of arbitration awards. And I'm happy to walk through the key two elements here. I think it's a two-step analysis. There's an objective element and a subjective element that neither really are satisfied here. Objectively, the question is, was there a clear law that applied? And we submit to the court, and as a district court concluded, there was not. The nation has relied upon the various statutes under EGRA, but those really only go to approving a new compact or approving an amendment to a contract. Neither of which are in play here. There's no dispute. I think the nation has already conceded that this is not an amendment. Isn't that correct? That's correct. And it's interesting. I want to pick up on that point, though, because it's interesting and kind of jumping to the second element subjectively, but let's focus on the first before I get to this next point. But first, objectively, the statutes on their plain face do not apply. There's nothing in the statute that suggests that the secretary plays any role in reviewing arbitration awards or reviewing arbitration panels and interpretation of a compact. Nothing in the law. And they don't cite any law or case to support that premise. They're extrapolating different policies to suggest that's how the court should read the law. I submit to the court that's not how the law should be read. But that's not, frankly, the standard. The standard is whether or not the panel here, in considering this, did they disregard a clearly applicable law. And I submit to the court that we think the panel got this right, that this law does not apply. But even if they got that wrong, that question, that's not sufficient to vacate this award. And I just want to, you know, just look at that. That's in part, I take it, because they clearly, with the benefit of the dissent, they understood and they grappled with this issue that's being raised. So they didn't disregard the law. They just did what they did. That's right. I mean, basically, the nation disagrees ultimately with their conclusion that, you know, with respect to whether or not they had the authority and jurisdiction to interpret the party's contract. What is the scope of the secretary's approval? So perhaps you can educate me on this. Assume for a moment that what both parties agree is a critical part of the compact does not get to the secretary's desk. So there are, you know, 50 pages, but two critical provisions are not reviewed by the secretary. But the rest of the compact is is is approved pursuant to the statute and to regulation. But what happens with that? Those, you know, two critical or one critical provision that is not actually reviewed by the secretary, because I've been asking questions of your adversary that relate to the fact that, yes, secretary approved the contract, the compact. But there may be situations, I don't know, where, you know, critical portions are not specifically reviewed and and and approved. What happens then? I think there's a few a few pieces to that, Your Honor. And I think it's critical to keep in mind that the way that the secretary approval set up, they review and approve a compact on the front end. And that includes particularly approving the dispute resolution provision in the party's contract. So that's part of the contract that the secretary approves. And that's what the secretary approved here. So to the extent there is any dispute about the scope of that agreement, which, again, this is a dispute about what the existing approved agreement provides. There's no new term. There's no additional amendment to the agreement that's conceded. No dispute there. So the secretary approving this agreement approved the process by which, you know, any, any dispute about the terms would be resolved. I guess what if there is compelling evidence that the secretary was wholly or entirely unaware of a critical provision? So I'm trying to get at what does it mean to approve the compact? Well, I think it means a number of things. First off, I think that's going going much further than one needs to go here. Number one, I understand that. Number two, I'd also suggest as the panel, I should say as the as the panel concluded, there was no evidence to suggest that there was any type of misleading of the secretary. No, that's not what I'm saying. Just go. Go with me. Just go with me. I'm trying to understand the parameters of this and just understand the process. I think the process is the agreement is approved per its terms. And all those terms are enforceable, including the arbitration provision. And again, if there's an argument about an ambiguous term, that's not carved out of the arbitration agreement. There's nothing in the statutes that provide for approval that says if there's a disagreement about an approved agreement, then the secretary will weigh in on that. There's nothing. What if what if the secretary after the arbitration panel issued its decision? Explicitly disagreed with the the decision. I think I'm again trying to understand the parameters of understood this. I think there's two or three important points there, Your Honor. One, that time has come and gone in terms of the timing for the secretary to play a role here, whether it's approval of the compact initially or whether evidence from the secretary for the arbitration. The nation had their opportunity to present on that. They either presented it and it was it was either disregarded or waived. At this point, we have an arbitration award that subject to the FAA and subject to the party's agreement is final and binding. And it's this court that plays a role in enforcing an arbitration award and considering whether or not there's any basis to vacate that award. So I think that role is this court's role, Your Honor. And I don't think. Are you suggesting that there was a an opportunity to go to the secretary at some point in connection with arbitration or in parallel with the arbitration? I guess, you know, I would suggest that the nation could have presented evidence from the secretary. As I understand it, they did not. There's nothing presented to the panel on that. But number two, you know, the actual the decision that the record here is very clear that when the arbitration was initiated, the secretary, in fact, did indicate its view of the arbitration and who should be making this decision. The secretary specifically withdrew a technical assistance letter and said, we, you know, we, the Department of Interior, we defer to the arbitration. Why? Because that's the party's agreement. And that provides certainty. And this idea that after an arbitration fully plays out, evidentiary hearing, fully detailed reasoned opinion, that a party that didn't like the decision can then go back to the secretary and ask the secretary to review that determination. That's not something that's in the law. And frankly, I think that's inconsistent with the clear indication from the secretary. It says, no, I defer to the arbitration. That's the proper process the parties have agreed to and that I have approved. Unless there was manifest disregard, then the secretary would not defer, but neither would have the district court, I assume. Correct. And that kind of brings us back, I think, to the standard that the district court applied and that this court applies under the manifest disregard standard. And I talked about why I think on the plain terms of the statutes, they don't apply. But there's also the very important subjective element here, the intent of the arbitrators. There has to be a showing they intentionally acknowledged, understood that law applied and decided and disregarded it, flouted it. And I think, Judge Pooler, in your decision and the Wallace v. Banter or Butter decision, you noted it's important to take into account what was before the arbitrators. And here it's interesting. The argument made to them was about an allegedly new term, effectively an amendment. Now, that's not an argument they're making here, but that was the argument presented to the panel and they determined, no, we are not imposing a new term. We are we're basically exercising our clear mandate to interpret the parties contract. I think that's important to note here that there's this is, you know, very, very far afield from the very few cases the court has found to satisfy the very high bar of manifest disregard, such as the the New York Telephone v. Communications case, where it was clear the arbitrators acknowledged there was precedent on point and said, no, I'm not going to apply that. I'm going to apply out of circuit cases. I think that is night and day from what we have here. But again, even if even if the nation, as it does, and frankly, this court thinks that the arbitrators may have gotten it wrong, that is not enough to overturn the award. And I did I did want to speak, just Laurie, to your point about what I think is kind of a slippery slope in terms of the nation's argument going too far. This idea that ambiguous terms would be subject to some sort of extrajudicial review. I think administratively, as you know, it's just not workable, not practical. But in addition to that, there's nothing in the arbitration agreement or anywhere else that carves out ambiguous terms from the arbitration provision. Classic contract interpretation. That's what contract interpretation does. That's what arbitrators do. They interpret contracts and they also interpret and apply statutes. That is what they looked at. Extrinsic evidence, which they're allowed to do, as anyone is allowed to do in interpreting a contract. Isn't that correct? Correct. And again, this was a majority with the chair. The panel was a former federal district judge and certainly well within their authority, jurisdiction and expertise to interpret that a good thing or a bad thing. I think it's always good to have a very capable arbitrators who are analyzing the questions. But I just want to say, going back to the administrative point, this idea. There's nothing that suggests the secretary has to, you know, contemplate every permutation or interpretation that may of a term that's just unworkable. And again, the recourse and review of an arbitration award is incredibly limited. But again, to the extent that what we came out with here, again, this was the arbitration panel determined. Part of part of, I guess, the worry always in the context of litigation involving nations is that. And I think that the legislative history bears this out. We're told or it's suggested by Congress that we should really read everything in the light most favorable to the nation. And I don't think that you disagree with that. How, then, should we read not only the arbitrations, the majorities panel decision, but also the this this relationship between IGRA and the Federal Arbitration Act? That's a big question, but there's a few pieces of that. If I may, I'll take and try one at a time. One, that first premise, I would actually suggest this was something raised with the panel and they considered this and they ultimately concluded. And I don't think the nation has not put anything. There's no argument for the court on this. The panel concluded there's nothing that necessarily dictates or changes the way the panel should have interpreted this contract in terms of giving one side an advantage over another. I think generally that standard you're referring to, Your Honor, is about treaty interpretation. This is a bilateral contract. But it also seems there also seems to be some things in the legislative history that I read, at least, that suggested in the context of the compact and reading the compact. We are to view it in the way the way most favorable to the nation. Now, this is legislative history. It's not necessarily the language, but, you know, I certainly understand the Congress's concern. All I say to that, Your Honor, is the panel did consider that argument and ultimately concluded in interpreting the contract. They should do it, you know, consistent with standard contract interpretation. And I think that even if we think or disagree with that, that wouldn't be a basis to vacate. But to your other point, I think answering your other question, Your Honor, and this goes to this idea of a potential conflict in FAA and EGRA. I don't think there's a conflict here. I think that it's pretty clear that the parties agreed to arbitrate their dispute. They agreed that any award would be final and binding and would be subject to enforcement by the district court. So I don't think there's a conflict. But even if there is, I think we cited to a Tenth Circuit case that recognized that, generally speaking, EGRA doesn't say anything to suggest that it undercuts or trumps or supplants the FAA. And I think ultimately there is, as I'm sure the court rightly knows, under the FAA, there is a very strong, certainly, deference and preference and, you know, inclination to enforce arbitration awards. Certainly, that's why they're subject to such a high standard of review. Counselor, your time has long expired. Thank you. Thank you. We'll hear from Seneca. Thank you, Judge Pooler. I want to go first to Judge Loye Hayes' questions about what exactly was approved with the compact. Well, the Secretary made that crystal clear with respect to revenue sharing. She made it very clear that she was approving payments for years 1 to 14. She lays that out in her approval letter. She also lays out, as the Secretary has elsewhere, that she applied great scrutiny to that provision. And footnote 8 of our opening brief shows that there are 700 compact payment provisions in effect in this country. They've all received express secretarial review. That is what did not happen here. Yes, it's true that the majority acknowledged the approval requirement. But as this court has said in Halligan, Westerbeek, and many other cases, simply acknowledging the law is not enough. Did you have an opportunity to go to the Secretary at some point? Your Honor, the nation has attempted to go to the Secretary several times. Before the award, the Secretary solicited a technical assistance letter, which the court has seen, which is squarely at odds with the holding of the panel majority. The Secretary declined review because the State of New York didn't participate in the request for review. Isn't that correct? I think what the Secretary said in withdrawing the letter was that it had hoped that its interpretation would provide certainty to the parties. But the State then, of course, went ahead and commenced arbitration. And so in withdrawing the letter, the Secretary noted the tendency of arbitration. But the Secretary never says in that letter, and this is critical, never says that she was abdicating her approval authority. The Secretary couldn't do that legally. The Secretary deferred to the panel. But the Secretary declined review, correct? I think you may be referring, Your Honor. I'm talking about after. After, to the amendment submission, the Secretary said, I don't have a certification from the State. I need a certification from the State to review. And then I would be happy to review. I welcome such a submission from the parties. The State, though, with the arbitration decision in hand, including the enforcement part of it, sitting in the catbird seat. So the State had no reason to certify. But the Secretary clearly would consider the application. And that brings me to one of the important points here, which is we argued the primary jurisdiction referral possibility to the district court. We've argued it to this court. A primary jurisdiction referral would give this court the opportunity to get the views of the Secretary on this critical matter of IGRA administration. And I do not understand why the district court did not avail itself of that opportunity. This is a really important matter of federal administration. In the Ellis case, this court said that primary jurisdiction ensures that there's not inconsistent administration of federal policy between the courts and the agencies. And here you have the agency saying we apply great scrutiny to revenue sharing provisions. And we have the district court and the panel majority saying we're going to allow for this implicit preapproval of ambiguous provisions. That's far end of the spectrum from great scrutiny. Are arbitration provisions, again, I just need some education. Are arbitration provisions routinely part of these gaming compacts? They are in some cases and not in others, Your Honor. That's a negotiable point. That is, nations and states can, obviously, you're telling me I take it, can agree not to arbitrate disputes. Is that right? That is correct, Your Honor. And that goes to your question about the relationship, though, between the FAA and IGRA. And here I think the Eighth Circuit's decision in the Missouri River Services versus Omaha tribe case is very instructive. Because that was an arbitration decision that the Eighth Circuit then vacated. Because the Eighth Circuit said that the arbitrators had gone beyond IGRA's strictures in ordering enforcement of an award there. And it was a very interesting case because there was a management contract which requires approval by the secretary. Its plain terms did not allow for the arbitration award. There had then been subsequent agreements negotiated between the tribe and the company which had not received secretarial approval. The arbitrator looked to those awards and the Eighth Circuit said, no, secretarial approval is a very important requirement of IGRA. And we're not going to enforce an award that contravenes that approval requirement, which is exactly what we have here. We have the panel seeking to enforce an award of a provision that clearly was not reviewed by the secretary. And that award comes subject to the strictures of IGRA. The compact, the arbitration provision, was entered into pursuant to IGRA. And the secretary has made it very clear that great scrutiny of revenue sharing provisions is a linchpin of the statute. So for the district court to not even ask the secretary under the primary jurisdiction doctrine for its views as to whether it had approved this compact provision by virtue of approving the arbitration agreement, which is the state's argument, the district court's argument, what's been advanced here, I don't understand why the secretary would not have that opportunity. The problem for you, particularly when you recite or cite to this Eighth Circuit, what is it, Missouri River case? Yes, Your Honor. Is that in that case, the term or the provision was deemed to be unambiguous. And you've already agreed that the term here was ambiguous. I don't think that hurts us at all, Your Honor, because the question is whether the secretary explicitly approved the provision. And what the panel majority, and this goes to your questions, Judge Pooler, about what the panel majority did or did not do. What it said about the renewal provision, and this is Appendix 59, is it is ambiguous whether the term renew means that the contribution payments continue at the 25% rate in effect when the initial term ended, or whether renew means to continue with the original terms that did not expressly provide for any state contribution payments in years 15 to 21. So the panel majority itself is saying you can't glean from the face of this compact what the secretary reviewed, any payment obligation for years 15 to 21. If that's true, how then could the secretary have approved a payment obligation for years 15 to 21? It simply wasn't in front of her. And this is why the standard is met here. The majority's own reasoning flouts the law that it recognized. We'll have to stop. You've long exceeded your time. Did you want to say something in conclusion? It's simply, Your Honor, that one can't backfill an express requirement, which is what the panel majority sought to do here. And at the very least, we would ask this court to refer the question to the secretary for his views on this matter of critical federal Indian law policy. Thank you. Thank you. Thank you both. Very nice argument. We'll reserve the session.